IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHAD ALAN HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 06-cv-645 |
| | ) | |
| SILAS M. IRVIN, DENNIS ROLKE, | ) | Judge Robert M. Dow, Jr. |
| LAZO SAVICH, JAMES DIAMOND, | ) | |
| and JAMES HENRY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Chad Alan Hicks ("Hicks") filed this prison civil rights lawsuit on May 2, 2006 [13]. After weathering a motion to dismiss, Hicks filed his Third Amended Complaint ("Compl.") [124] in October 2009. Defendants' position in this lawsuit is that Hicks did not exhaust his administrative remedies before filing suit in federal court, which he was required to do under the Prison Litigation Reform Act ("PLRA" or the "Act"). The Court denied Defendants' motion for summary judgment on the exhaustion issue [142]. To finally resolve the exhaustion issue, the Court held a hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). Upon careful consideration of the testimony and evidence presented at the hearing, and the parties' post-hearing briefs, the Court concludes that Defendants have not met their burden of proving that Hicks failed to exhaust all available administrative remedies before bringing suit.

**I.    Factual Background**

Hicks was housed at the Chicago Metropolitan Correctional Center ("MCC") in October of 2005 and again in April-June of 2006.[1] Hicks alleges that his cell conditions in the MCC "for

---

[1] Hicks spent the period between October 25, 2005 and April 27, 2006 at the Ogle County Jail.

1

at least 6 days" in October 2005 were such that Defendants deprived him of his "basic human needs." Compl. at ¶¶ 33-37. Hicks further alleges that in May 2006, he was placed in administrative detention by Defendant Dennis Rolke, a correctional officer at the MCC, "in retaliation for Plaintiff's actions relating to this law suit." *Id.* at ¶¶ 39-43. Hicks testified that he submitted grievances regarding both his cell conditions and his retaliation claim within the time period allotted for submitting each of the grievances.

### A. BOP Policies Regarding Inmate Grievances

The Federal Bureau of Prisons ("BOP") has established an administrative remedy procedure though which inmates may seek review of a complaint relating to any aspect of their confinement. See 28 C.F.R. § 542.10 *et seq*. The Court discussed these procedures at length in its prior memorandum opinion and order, but they bear repeating here. Under the regulations, an inmate commences the grievance process by "presenting an issue of concern informally to staff." 28 C.F.R. § 542.13(a). This may be done orally, or through the use of a "BP-8" form. Filing a BP-8 form is not mandatory. (Tr. at 123).[2]

If there is not a satisfactory resolution through the informal process, the regulations provide, with exceptions not applicable here, that the inmate must complete a form BP-9 within 20 days of the complained-of incident. *Id.* § 542.14(a). The form must be submitted "to the institution staff member designated to receive such Requests (ordinarily a correctional counselor)." *Id.* § 542.14 (c)(4). The MCC's Inmate Handbook expressly instructed inmates to submit their grievance forms to their counselors. (See, *e.g.* Def. Ex. 1, pg. 7).[3] In all instances,

---

[2] The Court will cite to the transcript of the *Pavey* hearing as "Tr. at ___."

[3] If the inmate's complaint is "sensitive," the inmate has the option of filing his BP-9 directly with the regional office. 28 C.F.R. § 542.14(d)(1) ("sensitive" grievances are those where "he inmate reasonably believes the issue is sensitive and the inmates' safety or well-being would be placed in danger if the Request became known at the institution"). If the regional office rejects the complaint because it

an inmate who properly submits a BP-9 form is entitled to some type of notification or response from the correctional facility indicating that his grievance form was received and processed. (Tr. at 128); 28 C.F.R. § 542.11 (a)(2) (prison officials "shall * * * [a]cknowledge receipt of a Request or Appeal by returning a receipt to the inmate.").

For those who are unsatisfied with the Warden's response to the BP-9 form, Section 542.15 of the regulations governs appeals. The regulation provides:

> An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. [* * *] Appeal to the General Counsel is the final administrative appeal.

28 C.F.R. § 542.15(a). Section 542 also governs the form that the appeal generally must take. "Appeals to the Regional Director shall be * * * accompanied by one complete copy or duplicate original of the institution Request and Response." *Id*. § 542(b)(1). If a Request or an Appeal does not conform to regulatory requirements, it may be bounced back to the inmate: "The Coordinator at any level (CCM, institution, region, Central Office) may reject and return to the inmate without response a Request or an Appeal that * * * does not meet any * * * requirements of this part." *Id*. § 542.17(a). When a submission is rejected, the inmate must be provided with a written notice explaining the reason for the rejection (*id.* § 542.17(b)) and the rejection, too, may be appealed (*id.* § 542.17(c)). At each level of the process, after 40, 50, or 60 days (as applicable), "the inmate may consider the absence of a response to be a denial at that level." *Id*. § 542.18.

---

determines that the complaint is not sensitive, the inmate may then pursue the matter by submitting the complaint locally to the warden at the institution in which the inmate is housed. See *id.*

3

Board of Prisons ("BOP") attorney Vincent Shaw testified at the *Pavey* hearing. Shaw was the Administrative Remedies Coordinator at the MCC during the relevant period. Shaw's duties as Administrative Remedies Coordinator included overseeing the operation of the remedies process, ensuring that inmates had access to necessary forms, and reviewing the official responses that were generated in response to grievances. (Tr. at 64-65). Shaw testified at length regarding the computer database known as "Sentry" in which the BOP tracks grievances filed by inmates in the BOP system, including the regular practices used at the MCC for accepting grievances and entering them in to the Sentry system. (Tr. at 76-91). He was a highly credible witness on general practices concerning the handling of grievances at the MCC, but he presented no first-hand testimony in regard to Hicks's tenure at the MCC.

Shaw testified that if an inmate submitted a BP-9 that was facially defective in some way (for example, if the inmate failed to sign the form), the inmate would receive a computer-generated notice of rejection. (Tr. at 129-37). If, on the other hand, the form was facially satisfactory, the inmate's request would be entered into the Sentry database and a computer-generated receipt would be sent to the inmate. (*Id.*). The gist of Shaw's testimony was that any BP-9 that arrived at the administrative remedies offices would be "clerked in" to the Sentry system, regardless of whether the BP-9 was accepted for filing or was rejected for being procedurally defective. In all cases, Sentry would maintain a record of any BP-9 form that was clerked into the system. Shaw testified that the BOP Regional Director's Office in Kansas City tracks grievance forms in the same way as does the MCC, and logs both BP-9 and BP-10 forms that it receives.

From the Sentry system, the BOP can generate an Administrative Remedy Generalized Retrieval, which is a history of all the administrative remedies that an inmate has filed in the

BOP. (Tr. at 96-98). The Administrative Remedy Generalized Retrieval tracks all BP-9, BP-10, and BP-11 grievance forms that are filed by an inmate and entered into the Sentry system. (*Id*.). There is no record in the Sentry system for Chad Alan Hicks reflecting the filing of a BP-9 or BP-10 relating to Hicks's October 2005 cell conditions or a BP-9 filed with the MCC regarding Hicks's May 2006 placement in the SHU. (Tr. at 105-114; Def. Ex. 10).

Again, an inmate properly submits a BP-9 form by handing it to his correctional counselor. Shaw testified that a BP-9 would of course not be reflected in Sentry if it was misplaced (or intentionally discarded) by a counselor before being clerked in, or misplaced at the administrative remedies offices before it was entered into the system. (Tr. at 153). In short, an inmate must rely on the assistance of others to properly file a grievance; the inmate cannot directly place the BP-9 in the queue to be clerked in, much less create on his own an electronic record of the filing of his grievance.

### B. October 2005 Grievance

Hicks was placed in the MCC's Special Housing Unit ("SHU") on October 8, 2005, where he allegedly experienced inappropriate cell conditions including restricted access to water and a cell inundated with insects. (Tr. at 9, 161). At some point between October 8, 2005 and October 23, 2005, while Hicks was housed in the SHU, Hicks obtained blank BP-8 and BP-9 forms from his counselor, Mr. Owens. (Tr. at 18-19). Hicks testified at the *Pavey* hearing that immediately after obtaining the forms, he filled them out, complaining of the inappropriate cell conditions. (Tr. at 19, 162).

Hicks testified that after completing the BP-8 and BP-9 forms, he obtained a blank "copout form" from a correctional officer.[4] (Tr. at 15). The copout form had a carbon copy

---

[4] An inmate request to a staff member (form BP-S148) is commonly called a "cop-out" and is used to make a written request to a staff member. Any type of request can be made with this form.

5

attached to it. Hicks testified that he handed the front copy of the October 23, 2005 copout form to the same officer who had given him the blank form and kept the carbon copy of the form for himself. (Tr. at 15-16). The carbon copy of the copout form was introduced into evidence at the hearing. (See Pl. Exh. 2). The copout form is dated October 23, 2005 and was addressed to Hicks's correctional counselor, Officer Owens. Hicks wrote on the copout form: "Can you please come down here to segregation to see me, I need to talk to you please? Also I have administrative remedy forms to turn in to you." (*Id.*). Hicks testified that the "administrative remedy forms" that he was referring to in the October 23, 2005 copout form were the BP-8 and BP-9 forms that he had prepared regarding his cell conditions. (Tr. at 16). Hicks expected that the correctional officer would give the copout form to Owens, and the correctional officer told Hicks that he would make sure Owens received the form. (Tr. at 22).

Hicks testified that in response to receiving the copout form, Owens came to see him at his cell in the SHU. (Tr. at 22-23). This visit would have taken place either on October 24. 2005 or on the morning of the 25th (Hicks testified that the visit happened "after October 23, 2005" (Tr. at 22) and Hicks was transferred out of the SHU at around 10:18 a.m. on the morning of October 25). Hicks testified that during this visit, he handed Owens the BP-8 and BP-9 forms.[5] (Tr. at 23). Hicks kept no copies of the forms that he handed to Owens at that time. Hicks testified that the BP-8 form did not include a carbon copy for him to retain. And while the BP-9 form did include a carbon copy, Hicks testified that he believed that he was required to submit BP-9 forms with all carbon copies attached. (Tr. at 17). Hicks further testified that he believed that as an inmate housed at the SHU, he was unable to have photocopies made. (Tr. at 13).[6]

---

[5] The Court will refer to this BP-9 form as the "October 2005 grievance."

[6] Shaw testified that inmates housed in the SHU did in fact have access to photocopiers. (Tr. at 76). Shaw also testified that it was "common" for inmates to retain a carbon copy of the BP-9 form

6

Hicks testified that he expected to receive a response from these forms within 20-21 days after submitting them to Owens. (Tr. at 26).

Hicks testified that he never received any sort of receipt or response from the MCC after submitting the October BP-8 and BP-9 forms to Owens. (Tr. at 163). No one ever returned the forms or copies of the forms to him. (Tr. at 162). Hicks did not follow up with the BOP to *specifically* alert them that he had not received a response to his grievance. (Tr. at 39). However, Hicks made some sort of communication to the Warden's office regarding his conditions of confinement in the SHU in October of 2005.[7] Again, Hicks was transferred to the Ogle County Jail on October 25, 2005.

To counter Hicks's testimony that he gave Owens a BP-8 and BP-9 form on either October 24 or 25, 2005, Defendants presented evidence that they argue suggests that Owens did not enter the SHU unit where Hicks was housed on those days. The BOP maintained a sign-in log book in the vestibule area at the entrance to the SHU. Staff members were supposed to sign

---

(suggesting that they were not prohibited from doing so). (Tr. at 76). On the other hand, Owens testified in his deposition that "[u]sually if the inmate is informed how the BP-9 work[s] he turns everything in with all the carbon copies." In view of Owens's testimony, the Court cannot fault Hicks for not retaining a copy of the BP-9 form that he claims to have submitted through Owens.

[7] Defendants attempt to show that Hicks's testimony regarding whether he followed up with the BOP about his October 2005 grievance has been inconsistent. (Def. Mem. [150] at 6-7). To support this, Defendants first cite to page 39 of the hearing transcript, wherein Hicks testified that he never contacted MCC staff about their failure to respond to the October 2005 grievance. (Tr. at 39:12-20). Shortly after giving this testimony, Hicks corrected himself, stating "[w]ell, thinking back, thinking back now, I believe I wrote and I got a letter back from a secretary, the warden's secretary, but you know, my letter, I don't remember what I wrote." (Tr. at 40:8-12). The Court sees no inconsistency here—only a witness correcting himself seconds after misspeaking. Further, the Court finds no inconsistency between this testimony and a letter dated December 27, 2005 from the MCC's Warden. The letter claims to be "in response to your inmate request to staff member, dated December 20, 2005, in which you claim that you were placed in the [SHU]." The letter continues to dispute that Hicks was ever "placed in a dry cell status." The letter from the Warden shows that Hicks did, in fact, make some sort of communication to the Warden's office about his confinement at the SHU (*id*.), which is consistent with Hicks's corrected testimony at the hearing. However, Defendants are correct that the Warden's letter does not refer to a BP-9 or BP-10 that Hicks had filed regarding the conditions of his confinement, or otherwise reflect that one had been filed.

7

the log book each time they entered or exited the SHU. (Owens Dep. at 84-85). However, Owens testified that he does not always sign the log-in book. (See *id.* ("that happens sometimes * * * [s]ometimes it doesn't. What I mean by that is staff is supposed to do that but they don't necessarily do it. Sometimes they forget to do it and they go in and out of there. I have gone in and out at times and may have forgotten to sign out or perhaps even sign in depending on if there was an emergency in the building or whatever."); *id.* at 113 (Owens acknowledging that he "sometimes may have forgotten to sign it to be honest with you.")). Defendants introduced into evidence portions of the SHU sign-in log book. There is no entry that reflects that Owens entered the SHU on October 23 or 24. The Log Book reflects that Owens signed in to the SHU at 5:30 p.m. on October 25, 2005—several hours after Hicks had left the MCC for transfer to Ogle County Jail.

For his part, Owens testified that he had no memory of Hicks whatsoever. (Owens Dep. at 105-109). Owens further testified that he has no memory of receiving a BP-9 form from Hicks or discussing such forms with him (either in October 2005 or in May-June 2006). *Id.* However, Owens made regular rounds in the SHU during his tenure at the MCC (which lasted from 1992 to 2008). (*Id.* at 111-117, 120-121). Owens testified that it was possible that Hicks could have submitted these forms to him. (*Id.* at 108). Owens also testified that completed grievance forms were sometimes misplaced at the MCC. (*Id.* at 74).

Next, Hicks testified that he filed a BP-10 appeal form with the Regional Director's Office that was related to the inappropriate cell conditions that he suffered. (Tr. at 28; Def. Ex. 15 (Hicks Declaration) at ¶7). Hicks testified that he never received any sort of response to this filing. (*Id.*). Again, there is no record in Sentry of such a BP-10 ever being submitted to the Regional Director's Office. (Tr. at 105:8-114:11).

### C. June 2006 Grievance

After being sentenced, Hicks returned to the MCC in April 2006. On May 18, 2006, Hicks was again placed in the SHU, where he remained until he was transferred to another prison, on June 7, 2006.

Hicks testified that at some point before leaving the SHU, he completed a BP-9 form, complaining that he had been placed in the SHU on May 18 without justification. (Tr. at 46-50, 166-169). This time, before submitting the form, Hicks testified that he retained the two carbon copies that were appended to the back of the form.[8] (Tr. at 46-48, 166). Hicks testified that he handed the original of the form to Owens, and on June 1, 2006, mailed one of the carbon copies to the office of the Regional Director of the BOP. (Tr. at 49-50, 166-167). A copy of the form was introduced into evidence at the hearing. At the top of the form, Hicks wrote "mailed on 6-1-06 to Regional Director."

There is no record in the Sentry system showing that Hicks filed the June 2006 BP-9 at the MCC. However, the BOP's Sentry records *do* reflect that Hicks submitted a BP-9 to the Regional Director's Office under the procedure for "sensitive" grievances. (Tr. at 109-114; see also *supra* n. 3). The Sentry records reflect that the Regional Director's Office rejected Hicks's BP-9 on June 5, 2006 because it deemed that the grievance was not in fact sensitive, and consistent with the applicable regulations (see 28 C.F.R. § 542.14(d)(1)) Hicks needed to file his BP-9 with the MCC if he wished to pursue the grievance. (Tr. at 110-114). Shaw testified that the Sentry system would have generated a notice to this effect which would have been delivered to Hicks. (*Id.*).

---

[8] Hicks testified that the reason that he detached and kept a carbon copy of the BP-9 was to ensure that he had a record of submitting the grievance form, given the fact that he never received any kind of response or feedback related to the administrative remedy forms that he had submitted in October 2005. (Tr. at 48, 167). The Court will refer to this BP-9 form as the "June 2006 grievance."

9

Hicks testified that he never received a response or notice of rejection from the MCC regarding the June 2006 BP-9. (Tr. at 49, 169-170). However, Hicks testified that he was aware that the Regional Director's Office had rejected his June 2006 BP-9. (Tr. at 47-49).

Defendants argue that the face of the form suggests that Hicks sent it to the Regional Director's Office but did not turn a copy in to the MCC. For one, Hicks wrote "mailed on 6-1-06 to Regional Director" on the form, but did not include a notation memorializing the date that he submitted the June 2006 grievance to the MCC. Further, Defendants argue that the text of the narrative section of the BP-9 suggests that it was intended for the Regional Director's office, not the MCC. The narrative text in the form reads in part: "This is my 3rd Administrative Remedy to your office. Why am I being harassed and placed in seg? This is my second time with problems w/ Rolke and M.C.C." (emphasis in original). Additionally, Defendants argue that "Hicks's claim that he simultaneously submitted this form to both the MCC and the Regional Director's Office simply makes no sense" because "[t]he only reason an inmate submits a BP-9 directly to the regional office is because the inmate believes that he may be adversely affected by the submission of this request at the institution level because of the sensitive nature of the complaint." (Def. Mem. at 9 (citing 28 C.F.R. § 542.14(d)(1)).

## II. Analysis

The Court set forth the applicable legal standard in its prior opinion [142], but will summarize it here for the reader's convenience. The Prison Litigation Reform Act of 1995 ("PLRA") provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to *Bivens* suits, such as Hicks's, that are

brought directly under the United States Constitution. See, *e.g. Dale v. Lappin*, 376 F.3d 625, 655 (7th Cir. 2004). The PLRA requires "proper" exhaustion. That means that an inmate must comply with an agency's deadlines "and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006). In other words, the inmate must comply with the applicable rules on filing, including the form of the document. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."). The Supreme Court has held that the failure to satisfy this requirement is an affirmative defense that must be proved by the party asserting it. *Jones v. Bock*, 549 U.S. 199, 211-212 (2007); *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005).

In its prior opinion denying Defendants' motion for summary judgment ([142] at 12-14), the Court construed the BOP guidelines and applicable Seventh Circuit precedent and concluded that if Hicks had properly filed BP-9 forms with the BOP and had heard nothing back, he would have been unable to appeal and would have properly exhausted his administrative remedies. *Id.* (discussing *Brengettcy v. Horton*, 423 F.3d 674 (7th Cir. 2005); *Dole v. Chandler*, 438 F.3d 804, 809-10 (7th Cir. 2006); *Pozo*, 286 F.3d at 1025; and *Devbrow v. Carroll*, 2009 WL 2750004, at *2 (S.D. Ind. Aug. 26, 2009)).

As discussed above, in order to determine whether Hicks exhausted his administrative remedies, the Court held a hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). In *Pavey*, the Seventh Circuit determined that it is the province of the judge—not a jury—to determine whether a plaintiff has complied with the PLRA's exhaustion requirement. *Id.* at 741-42. At the *Pavey* hearing, a judge is empowered to resolve factual disputes pertaining to exhaustion and to make credibility determinations about the witnesses. See *Towns v.*

*Holton*, 364 Fed. Appx. 97 (7th Cir. Sept. 22, 2009) (unreported) (remanding case to district court when court merely accepted defendants' exhaustion arguments without making credibility finding about inmate's argument); *Hopes v. Mash*, 2010 WL 3490991, at *5 (S.D. Ill. Aug. 31, 2010) ("*Pavey* itself provides the authority for resolution of factual disputes by a court regarding the issue of administrative exhaustion, if a hearing on the matter is conducted, where the Court has the opportunity to hear witness testimony and consider submitted evidence, in order to make such credibility determinations.").

### A. October 2005 Grievance

The Court concludes that Defendants have not met their burden of proving by a preponderance of the evidence that Hicks did not file his October 2005 grievance.

On the one hand, Hicks directly testified at the *Pavey* hearing that on October 24 or 25, 2005, he handed completed BP-8 and BP-9 forms to Officer Owens, complaining about his cell conditions in the SHU. Hicks testified that he never received a receipt, response, or notice of rejection for his grievance. The Court found Hicks's testimony at the *Pavey* hearing to be credible for a number of reasons. First, the October 23, 2005 copout form that Hicks produced read in part "I have administrative remedy forms to turn in to you." This form is contemporaneous (yet circumstantial) evidence that Hicks indeed had completed forms to turn into Owens.[9] Indeed, it really would not make sense for Hicks to have bothered to complete the copout form and request a counselor to visit him if he had not actually filled out the grievance forms. Furthermore, throughout this lawsuit, Hicks has consistently told the same story regarding his October 2005 grievance—that he handed a BP-9 form to Officer Owens but never received a receipt, response, or notice of rejection for his grievance. Hicks's testimony at the

---

[9] Similarly, the December 27, 2005 communication from the MCC's Warden, which disputes a contention from Hicks that he was "placed in a dry cell status," suggests that Hicks made some sort of complaint to the MCC regarding his cell conditions in October of 2005.

*Pavey* hearing was consistent with this story. Additionally, the Court evaluated Hicks's demeanor on the stand and found him to be credible.

On the other hand, under the specific circumstances of this case, the evidence that Defendants introduced was insufficient to convince the Court that it was more likely than not that Hicks's testimony that he filed the October 2005 grievance was a fabrication. To counter Hicks's direct testimony that he filed the October 2005 grievance, Defendants argue that the "absence of any record of these claims in the Sentry system is evidence that these forms were never submitted." (Def. Mem. [150] at 5 (citing Fed. R. Evid. 803(7)). The Court agrees with Defendants that the lack of a record in Sentry regarding Hicks's October 2005 grievance is credible and significant evidence that it was never filed. However, the testimony in this case showed that the lack of a Sentry record is not *sufficient* to establish the grievance was never filed. Administrative Remedies Coordinator Vincent Shaw testified that Sentry would have a record of all grievances that were "clerked into" the system. However, Shaw admitted that a BP-9 would of course not be reflected in Sentry if it was misplaced (or intentionally discarded) by a counselor before being clerked in, or misplaced at the administrative remedies offices before it was entered into the system. Owens testified that completed grievance forms were sometimes misplaced at the MCC. In this case, in light of Hicks's direct testimony that he handed the October 2005 grievance to his counselor for filing, and the additional contemporaneous documentary evidence that he offers to support that testimony, the absence of a record of the form in Sentry is not dispositive.

The other arguments that Defendants present to cast doubt on Hicks's credibility are not convincing. First, the SHU log book does not contain an entry showing that Officer Owens entered the SHU during the time period that Hicks testified that he handed Owens the October

2005 grievance. Such testimony might be entitled to considerable weight if, for example, if there were evidence in the record that prison employees were required to use a key card for access to the SHU, and thus the "log" of the employees' comings and goings was demonstrably accurate. However, the record here contains Owens's own testimony that he did not always sign the log book. See, *e.g.* Owens Dep. at 113 (Owens "sometimes may have forgotten to sign it to be honest with you."). It is important here to note that Owens had no specific recollection of Hicks, and admitted that it was possible that Hicks gave him forms to be submitted.

Second, the Court cannot give substantial weight to the fact that Hicks could not produce a copy of the October 2005 BP-9 form that he handed to Officer Owens. Hicks testified that he thought that he was required to turn in BP-9 forms with all of the carbon copies attached, and Officer Owens similarly testified that inmates usually "turn[] everything in with all the carbon copies."[10] Further, while Shaw testified that inmates in the SHU could hand documents to guards to be copied, Hicks believed that he was unable to have copies made while in the SHU.[11]

### B. June 2006 Grievance

Unlike his earlier grievance, Hicks was able to produce a copy of the June 2006 grievance that he testified that he filed with the MCC. As discussed above, the June 2006

---

[10] Defendants argue that Hicks's testimony that he believed he could not retain one of the carbon copies of the October 2005 BP-9 is undermined by the fact that Hicks *did* in fact retain one of the carbon copies of the June 2006 BP-9. But Hicks's explanation for why he retained a carbon copy of the June 2006 BP-9 was plausible. Hicks credibly testified that because he had never received a response to his first grievance, he wanted to ensure that he had evidence of the second.

[11] As noted above, Hicks claims that he mailed a BP-10 appeal form to the Regional Director's office that was related to the inappropriate cell conditions that he suffered in the SHU. Hicks testified that he never received any sort of response to this filing. There is no record in Sentry of such a BP-10 ever being submitted to the regional office. The parties do not spend much time discussing this form. This is perhaps because whether or not Hicks in fact attempted to file a BP-10 is irrelevant to whether he properly exhausted his administrative remedies. For, having not received a response to the BP-9, under the applicable regulations, it would have been impossible for Hicks to have properly filed a BP-10. 28 C.F.R. § 542.15(b)(1) ("Appeals to the Regional Director *shall be* * * * accompanied by one complete copy or duplicate original of the institution Request and *Response*.") (emphasis added).

grievance is dated "6-1-06" and the words "Mailed on 6-1-06 to Regional Director" are written across the top. Hicks testified that he handed the original of the form to Officer Owens to be filed at the MCC, mailed one of the carbon copies to the Regional Director on June 1, 2006, and retained one of the carbon copies for himself.

As with his earlier grievance, the Court concludes that Defendants have not met their burden of proving by a preponderance of the evidence that Hicks did not file his June 2006 grievance. Here, the fact that Hicks was able to produce a copy of the form that he said he filed gives credence to his testimony. That Hicks actually did mail the form to the Regional Director's office (and that Sentry had a record of receiving this form) is further evidence that Hicks did attempt to file the June 2006 grievance. For the reasons explained above, the lack of a record in Sentry showing that the June 2006 grievance was filed with the MCC does not completely undermine Hicks's testimony.

As discussed above, Defendants point out three things about the face of the June 2006 grievance itself that suggests that it was filed with the Regional Director's Office, but not at the MCC. First, just because Hicks did not include a notation on his copy of the BP-9 that indicated that he filed the form with the MCC does not establish that he in fact never did so. Similarly, Defendants get little mileage out of their argument that because the form discussed "problems w/ Rolke and M.C.C." it was obviously written *only* for the Regional Director's Office. Hicks admitted that he wrote the form intending that it be sent to the Regional Director's Office as well as the MCC. Defendants are correct that the cited language suggests that the form was intended to be filed at the Regional Director's Office, but the fact that such language was included does not necessarily suggest that the form was *not intended* to be filed at the MCC. And third, Defendants argue that it "simply makes no sense" that Hicks would have filed a grievance

simultaneously with the Regional Director and the MCC. To this point, as explained immediately below (see *infra* pg. 16), Administrative Remedies Coordinator Shaw testified that for whatever reason, inmates sometimes do file forms simultaneously with the Regional Director's Office and the MCC. No one asked Hicks at the *Pavey* hearing why he felt the need to file his June 2006 grievance simultaneously with the MCC and the Regional Director's Office, and in the absence of such testimony, the Court will not speculate as to what Hicks was thinking when he took that course.

Defendant's main argument with regard to the June 2006 grievance is that "[e]ven if the court accepts as true Hicks's testimony that he simultaneously submitted his BP-9 form to both the MCC and Regional Office, this testimony affirmatively establishes that Hicks failed to exhaust his administrative remedies." (Def. Resp. [154] at 7). To explain, Defendants argue that by mailing his BP-9 grievance to the Regional Office, Hicks was filing under the procedure for "sensitive" grievances. See 28 C.F.R. § 542.14(d)(1). That section provides as follows:

> Sensitive issues. If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

§ 542.14(d)(1). At the hearing, Hicks admitted that he received notice that the Regional Office had rejected his BP-9 as not meeting the standard for being a "sensitive" grievance. According to Defendants, after receiving this rejection, under the regulation, Hicks was "obligated to file his BP-9 with the MCC *after* he received notice that the Regional Office had rejected the BP-9, not simultaneous with the Regional Office filing." (Def. Resp. at 7).

The Court respectfully rejects Defendants' argument. During his deposition, Shaw testified that sometimes inmates do submit "a single grievance simultaneously to * * * the warden [at the MCC] and to [the] Kansas City [Regional Office]." (Shaw Dep. at 148). Shaw testified that under such circumstances, the two forms would receive "different ID numbers" and would be treated in the system as two separate grievances. (*Id*. at 148-149; see also *id.* at 154). It is clear that under § 542.14(d)(1), Hicks abandoned the grievance that he mailed to Kansas City by not re-filing it with the MCC after receiving notice that it had been rejected for filing in the Regional Director's office. But if Hicks's simultaneous filing of the June 2006 grievance with the MCC created a separate grievance, it is not clear how his rejection from the Regional Office would have affected the grievance properly filed at the MCC. In short, Hicks could have reasonably believed that he did not need to file his June 2006 grievance at the MCC after it was rejected from the Regional Director's Office, as he had already done precisely that.

* * *

The Court writes further to address the last point that Defendants make in their post-hearing briefs. Defendants argue that if the Court accepted Hicks's testimony that he properly filed his grievance forms, "every prisoner in the federal system could bypass Congress' requirement of exhaustion by doing nothing more than providing unsubstantiated testimony stating 'I timely filed all the necessary forms ant the Bureau of Prisons lost all of them.'" (Def. Resp. at 7-8). In the Court's view, no such sweeping generalizations can be drawn from the disposition of this case. To the contrary, if the record consisted solely of the bald assertion quoted above, the result very likely would have been different. However, as discussed above, Hicks's testimony that he submitted the appropriate forms was supported by a number of pieces of contemporaneous documentary evidence, all of which together support an inference that this

case may present an instance in which grievances were lost or misplaced after they left the inmate's hands but before they could be clerked in to Sentry. And Defendants' witnesses, though credible, could offer no direct evidence or testimony to contradict Hicks's story. Admittedly, this still was a close call. But under the specific circumstances here, and keeping in mind that the failure to satisfy the exhaustion requirement is an affirmative defense that must be proved by the party asserting it, *Bock*, 549 U.S. at 211-212, it would be inappropriate for the Court to dismiss Plaintiff's lawsuit on the basis of the record before it.

## III. Conclusion

For the foregoing reasons, the Court concludes that Defendants have not met their burden of proving that Hicks failed to exhaust all available administrative remedies before bringing suit.

Dated: June 7, 2011

_____
Robert M. Dow, Jr.
United States District Judge