# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CHAD ALAN HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 06-CV-645 |
| | ) | |
| SILAS M. IRVIN, TIMOTHY WRIGHT, | ) | |
| DENNIS ROLKE, CAPTAIN R. SAVICH, | ) | |
| LIEUTENANT DIAMOND, and | ) | |
| ADMINISTRATIVE WARDEN HENRY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment filed by Plaintiff Chad Alan Hicks [169] and Defendants Silas M. Irvin ("Irvin"), Dennis Rolke ("Rolke"), Lazo Savich ("Savich"), James Diamond ("Diamond"), and James Henry ("Henry") [172]. For the reasons set forth below, the Court denies Plaintiff's partial motion for summary judgment [169] and grants in part and denies in part Defendants' motion for summary judgment [172]. With respect to Count I, the Court grants Defendants' motion for summary judgment as it pertains to Defendant Rolke, but denies Defendants' motion as it pertains to Defendants Irvin, Savich, Diamond, and Henry and also denies Plaintiffs' motion. With respect to Count II, the Court denies Defendants' motion for summary judgment.

## I. Background

### A. Procedural Background

Plaintiff Chad Alan Hicks ("Hicks") filed this prison civil rights lawsuit without the assistance of counsel in 2006. The complaint names as Defendants several officials at the Metropolitan Correctional Center in Chicago ("MCC"). Hicks maintains that he was falsely

accused of assaulting a correctional facility officer; that he was placed for six days in a segregated, bug-infested "dry cell" that was inundated with feces; and that he was retaliated against for filing suit in response to these conditions. After weathering a motion to dismiss, Hicks filed his third amended complaint in October 2009, specifically alleging in Count I (against all Defendants) that his cell conditions violated the Fifth Amendment's prohibition on cruel and unusual punishment against pre-trial detainees and in Count II (brought only against Defendant Rolke) that Plaintiff was deprived of his First Amendment rights by being placed in administration detention in retaliation for the filing of this lawsuit.

Defendants previously moved for summary judgment under the Prison Litigation Reform Act ("PLRA" or the "Act"), arguing that Plaintiff had not exhausted his administrative remedies before filing suit in federal court. The Court denied the motion, concluding that the evidence in the record indicated that Hicks had used all of the regulatory hooks that were available to him. Each side now moves for summary judgment on the substantive claims. Plaintiff moves for partial summary judgment on Count I, and Defendants move for summary judgment on both counts.

### B. Factual Background

Hicks arrived at the MCC in August 2005, where he awaited trial on bank robbery charges. On October 8, 2005, Hicks was accused of assaulting Defendant Rolke, a correctional officer at the MCC. Hicks admits that he had an incident with correctional officers Rolke and Wright after he walked out of his cell and that he was ordered to the ground and handcuffed, but denies that he assaulted Rolke. Thereafter, Hicks was placed in Cell 1104 in the MCC's Special Housing Unit—segregated housing—where he would stay until October 14, 2005. The Special Housing Unit is a separate floor of the MCC to which inmates can be sent to be segregated from

the general population for disciplinary segregation resulting from an infraction of MCC rules. Inmates also can be placed in segregated housing for administrative detention pending resolution of a disciplinary investigation, where there is a need to separate them from other inmates or staff members. Inmates in the Special Housing Unit are confined to their cell for 23 hours a day and allowed out of the cell for one hour a day for showering (typically three times per week), recreation, or use of the law library.

Hicks maintains that the faucet in his cell—an inmate's only source of water in the cell—did not work. He claims that the only water he received each day he was in segregated housing was a four to six ounce glass of water that was served three times a day (with each meal). According to the testimony of Defendants, the lack of water in a cell is a "major problem" and a defective sink should be repaired immediately. Hicks also maintains that when inmates in the cells adjacent to Hicks' cell flushed their toilets, Hicks' toilet would back up. Hicks testified that the toilet was never fixed while he was in Cell 1104 and that he did not have a bucket to use for going to the bathroom. According to Hicks, because he could not flush the toilet properly, feces accumulated in the toilet over the six days that he was in Cell 1104. Defendants admitted that no inmate should be in a cell with a broken toilet and that if broken, a toilet should be repaired immediately. Hicks also maintains that each day he was in segregated housing, he noticed bugs in the sink drain and on the floor. He did not suffer any bug bites. As with broken toilets and faucets, the parties agree that the presence of bugs is a serious problem that should be immediately addressed.

The officers assigned to segregated housing kept a log book. Defendants would sign the log book when they made rounds through segregated housing. On October 13, 2005, Defendant Irvin, the MCC's Warden, made rounds through segregated housing. One of Irvin's job

responsibilities as Warden was to do rounds through segregated housing to make sure everything was running smoothly and to talk to inmates about any problems. On October 12 and 14, 2005, Defendant Savich, a captain at the MCC, signed into the log book. When he was making the rounds, Savich would stop by each cell and, if the inmate requested, he would talk to the inmate. Savich testified that he did not sign into the log book every time that he went on rounds, but because the unit fell directly under his responsibilities, he typically visited the Special Housing Unit "at least two, three, four times a week." Defendant Diamond, a lieutenant at the MCC, made rounds through the unit on at least October 11, 12, 13, and 14, 2005. Diamond regularly walked through segregated housing on average between "five and ten" times every day that he was working. Similarly, Defendant Henry, an associate warden, made rounds on at least October 13 and 14, 2005, and would "go cell to cell to cell to cell, acknowledge the inmates * * * try to talk to the inmates when * * * making rounds." Defendant Rolke never passed through the Special Housing Unit while Hicks was there.

Hicks maintains that he verbally complained to Irvin, Henry, Savich, and Diamond about the bugs, clogged toilet, and lack of water in Cell 1104 while they made rounds through segregated housing. Irvin testified that he does not recall whether Hicks complained to him about the lack of water, bugs, and broken toilet in the cell, but that if he did, corrective action would have been taken; Diamond stated that he had no "knowledge or recollection" about Hicks's defective toilet or lack of water while he was in segregated housing and that he was "100 percent certain" that Hicks did not talk to him about bugs in his cell; Henry testified that if Hicks had mentioned the toilet, a lack of water, or bugs to him, he would have instructed the appropriate staff to correct the problem; and Savich testified that Hicks never spoke to him about bugs in his cell nor does he recall Hicks telling him about a broken toilet or lack of water. On

October 14, 2005 at 2:29 p.m., Mr. Rafael Martinez from the facilities department of the MCC signed into the Special Housing Unit log book "to check on plumbing" for SHU cell 1104, although Mr. Martinez does not specifically recall this occasion. Hicks had been moved out of the cell earlier that day.[1]

On May 2, 2006, Hicks filed an amended complaint regarding his October 2005 cell conditions. The amended complaint and summons were served on Rolke on May 4, 2006. On or about May 18, 2006, Rolke claims that he heard from an inmate that Hicks was back in the MCC and discussing the lawsuit he had filed against Rolke. Hicks disputes that he ever discussed Rolke or his complaint with any other inmates at the MCC. Rolke informed his supervisor, Lieutenant Calvin Friar, that Hicks was discussing his lawsuit against Rolke with other inmates. Rolke testified that when he spoke to Lieutenant Friar, Rolke did not suggest or ask that Hicks be placed in segregated housing. The parties agree that correctional officers do not have the authority to write up transfer orders, but dispute whether correctional officers can authorize an inmate to go to the Special Housing Unit, for instance, by complaining about an inmate. According to Defendants, the discretion to place an inmate in segregated housing for administrative detention rests with the lieutenant supervising the shift.

On May 18, 2006, Hicks was placed in the Special Housing Unit, and after his placement, Lieutenant Friar generated an administrative detention order. The order states that Hicks was "being placed in administrative detention for security concerns." Although Friar does not have an independent recollection of issuing the May 18, 2006 administrative detention order, based on his reading of the administrative detention order, he believes that he issued the order placing Hicks in the Special Housing Unit because of security concerns. Friar testified that he believed

---

[1] Hicks was moved to another cell in the Special Housing Unit, where he remained until October 25, 2005, when he was transferred out of the MCC. He returned to the MCC on April 6, 2006.

that an inmate talking about a lawsuit that he filed against a correctional officer could undermine that officer's authority and raise a security concern justifying placing the inmate in administrative detention. Lieutenant Friar specifically stated that this was "a gray area" and"[i]t depends on how [the inmate's] talking about it, who he's talking about it with, if it's his lawsuit or if it's someone else's lawsuit." See Friar Dep. at 67:4-10, 103:7-105:4. Mr. Hicks was moved to the Special Housing Unit on May 18, 2006, where he remained until June 7, 2006.

## II. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). On cross-motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re. United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.,* 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The

party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Fifth Amended Due Process Claim (Count I) as to All Defendants

Both sides move for summary judgment on Count I. Plaintiff maintains that no issues of material fact exist as to whether there was running water in Hicks' cell, whether the toilet did not flush, and whether bugs infested his cell. He further contends that these conditions are sufficiently serious to constitute a due process violation. In support of his contentions, he argues that there is no dispute that Hicks complained to Defendants about these conditions, as Defendants testified that they cannot remember whether he told them about the conditions. In turn, Defendants maintain that Hicks' Fifth Amendment claim fails because the complained-of conditions were not the type of exceptionally harsh conditions that give rise to a Fifth Amendment claim and, furthermore, the claim is barred by qualified immunity. Defendants also maintain that if immunity does not protect Defendants from suit, the Fifth Amendment claim against Defendant Rolke still fails because there is no evidence that Rolke had any knowledge of or personal involvement with the conditions of Hicks's cell during his October 2005 confinement in segregated housing.

As a pretrial detainee, Hicks brings his conditions of confinement claim under the Due Process Clause of the Fifth Amendment. The Seventh Circuit has held that pretrial detainees are "entitled to at least the same protection against deliberate indifference to [their] basic needs as is

7

available to convicted prisoners under the Eighth Amendment." *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)); see also *Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002) ("The protections for pre-trial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'") (quoting in part *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Under the Eighth Amendment, "the plaintiff has the burden of showing that (1) the harm to the plaintiff was objectively serious; and (2) that the official was deliberately indifferent to [the plaintiff's] health or safety." *Cavalieri*, 321 F.3d at 620 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). When reviewing conditions of confinement, courts "consider the totality of the conditions of confinement to determine whether a prisoner has been deprived of basic human needs." *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989).

Hicks claims that Defendants violated his Fifth Amendment Due Process rights by failing to rectify the conditions that he claims to have experienced in the Special Housing Unit in October 2005. In his third amended complaint, Hicks alleges that, between October 8 and October 14, 2005, he was deprived of "basic human needs" in the Special Housing Unit because he was "deprived of water to care for himself or to drink, except for a small cup of water with meals," his cell was "infested" with "crawling bugs," and his cell was "inundated with feces when toilets in adjacent cells flushed." When asked at his deposition to provide more detail about these allegations, Hicks provided a substantially less dramatic, but still disconcerting, description of his cell conditions. At his deposition, Hicks stated that he saw bugs in his cell more than once a day, but beyond that could not say how often nor how may bugs he saw in his cell. With respect to the toilet in his cell, Hicks testified that he "cannot say it overflowed onto the floor out of the toilet but I know it would back up into the toilet" when a toilet in an adjacent

cell was flushed. With respect to his access to water between October 8 and October 14, 2005, Hicks testified that he was provided with 4-6 ounces of water at every meal, but had no additional drinking or washing water. Thus, assuming that Hicks's version of events is true, Hicks saw an indefinite number of bugs in his cell for six days, had a toilet that would not flush and backed up with his own and others' feces, and was provided with approximately 12 to 18 ounces of water per day. Defendants maintain that these conditions do not rise to the level required to implicate a protected liberty interest. Plaintiff maintains that these conditions are indisputably atypical (or "objectively serious") and therefore he is entitled to summary judgment.

Based on the case law, (i) access to water for drinking or washing, (ii) working plumbing, and (iii) freedom from bug infestations have been found to be basic human necessities in the prison context. See *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("[F]ilth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] * * * drinking water contain[ing] small black worms which would eventually turn into small black flies" would violate the Eighth Amendment); *Pritchett v. Page*, 2000 WL 1129891, at *9 (N.D. Ill. Aug. 9, 2000) (insect infestations can be actionable); *Ruff v. Godinez*, 1993 WL 239045, at *4 (N.D. Ill. June 28, 1993) (inadequate plumbing, coupled with insect infestation, rose to the level of Eighth Amendment violation); *Pelker*, 891 F.2d at 139 (placing a prisoner in a feces-smeared cell for three days without running water, while ignoring his requests for water and cleaning supplies, violates the Eighth Amendment); *Kimbrough v. O'Neil*, 523 F.2d 1057, 1059 (7th Cir. 1975) (conditions including lack of toilet, lack of water for drinking or washing, and lack of mattress, bedding, or blankets, "even for a period of three days, could constitute a violation of the Eighth Amendment"). Defendants themselves testified that the

lack of water, a broken toilet, and bug infestation are all serious conditions which should be immediately rectified. Moreover, Defendants have not presented an analogous case in which a court granted summary judgment because the conditions were not "objectively serious." Therefore, taking into account the totality of the circumstances and accepting Plaintiff's version of his cell condition, Plaintiff has demonstrated that he may have been denied basic needs.

But Hicks' request for summary judgment on Count I suffers from faulty logic. Although he *may* have been denied basic needs while in segregated housing, the record does not support an undisputed finding that he was. Hicks argues that because he testified that he verbally complained to Defendants Irvin, Henry, Savich, and Diamond about his cell conditions and because Defendants do not recall him or his time in the Special Housing Unit, Defendants cannot deny his allegations. However, just because Defendants do not recall Hicks making these complaints does not mean that Hicks complained. Hicks ignores the deposition testimony in which Defendants either deny that the conditions existed or state that Hicks' allegations cannot be true because, if such conditions had been brought to their attention as Hicks alleges, they would have taken immediate steps to remedy the situation. Hicks himself could not recall how often he complained or when exactly he complained or even what exactly he said. Therefore, questions of fact remain as to whether Hicks complained, to whom, and, if he did complain, when he made those complaints.[2] Defendants further testified that if Hicks in fact made these complaints, they would have rectified the situation. On this record, the inference can be made that Hicks never complained, or that he was not complaining about an objectively serious condition, just as easily as the inference can be made that Hicks complained and those

---

[2] For instance, if the trier of fact concludes that Hicks did complain, but not until October 13, just prior to being removed from Cell 1104, then the trier of fact may conclude either that the conditions were not objectively serious because of the short time frame or that the guards were not deliberately indifferent because they took prompt action. These questions cannot be resolved by the Court on this record and in fact are classic credibility determinations.

complaints went unanswered and created a constitutional violation. Plaintiff has not presented any case law, nor has the Court found any in its own research, which supports Plaintiff's theory that Defendants' lack of recollection spells summary judgment for Plaintiff.

There clearly are contested issues of material fact as to whether and when Hicks informed Irvin, Savich, Diamond and Henry of the alleged conditions of his confinement in October 2005 and whether those conditions existed in such a way or for a length of time so as to be considered "objectively serious." These contested factual issues preclude summary judgment for Plaintiff on the issue of whether the conditions in fact existed and whether Defendants Irvin, Savich, Diamond, and Henry acted with the requisite "deliberate indifference" to the alleged conditions. However, Plaintiff has not presented any evidence that Defendant Rolke was aware of the conditions in Plaintiff's cell such that he deprived him of his basic human needs or that he was deliberately indifferent to those conditions. Therefore, summary judgment for Defendant Rolke on Count I is appropriate. That leaves the remaining Defendants' qualified immunity argument.

Qualified immunity "protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is immunity from suit rather than merely a defense to liability. *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). The qualified immunity analysis comprises a two-part inquiry: (i) "whether the facts alleged show that the state actor violated a constitutional right," and (ii) "whether the right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

As previously set forth, a question of fact exists as to whether Defendants violated Plaintiff's constitutional rights by denying him access to basic human needs. The question that

11

remains is whether Plaintiff's right to these basic needs—water and sanitary cell conditions—was clearly established. A constitutional right is clearly established if a "reasonable officer" would have believed that the conduct at issue was unconstitutional "in light of the clearly established law and information [ ] possessed at the time." *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 472 (7th Cir. 1997). A court need not have ruled that the exact conduct at issue is unlawful; the appropriate test is whether the "contours of the right [ ] have been established so that the unlawfulness of the defendants' conduct would have been apparent * * *." *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 429 (7th Cir. 1989). Defendants still can be on notice that their conduct violates "established law even in novel factual circumstances;" that is, this case need not be "fundamentally similar" to any previous cases regarding conditions of confinement. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead, the "salient question" is "whether the state of the law [in 2005] gave [Defendants] fair warning that their alleged treatment of [Hicks] was unconstitutional." *Id.*

The Due Process Clause prohibits conditions that amount to the "punishment" of a pretrial detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hammond v. Briley*, No. 02 C 6990, 2003 WL 1845414, at *4 (N.D. Ill. April 7, 2003) ("longstanding case law has 'clearly established' that prison officials may not subject prisoners to conditions of confinement that violate the Constitution"); *Dugan v. Washington*, 2000 WL 336554, at *6 (N.D. Ill. March 28, 2000) ("[I]t has long been held that deliberately subjecting an inmate to cruel and unusual conditions of confinement may violate the Eighth Amendment."). As previously set forth, Seventh Circuit authority has established that conditions similar to those alleged to have been present according to Hicks' version of events are unconstitutional. See, *e.g., Jackson*, 955 F.2d at 22 (unfit drinking water, along with filthy state of cell and broken plumbing, was

unconstitutional); *Kimbrough*, 523 F.2d at 1059; *Johnson v. Pelker*, 891 F.2d at 138; *Robinson v. DeTella*, 1997 WL 53108, at *5 (N.D. Ill. 1997) (broken toilet did not flush properly and exposed inmate to his own waste, along with filthy state of the cell and exposure to cold air were the "type of conditions found unconstitutional for decades").[3] For instance, in *Vinning-El v. Long*, the Seventh Circuit found that the "clearly established" precedent "well before 2001" was that, among other cell conditions, a broken sink and toilet and exposure to human feces violated the Eighth Amendment by depriving a prisoner of the "minimal civilized measure of life's necessities." 482 F.3d 923, 924 (7th Cir. 2007) (internal quotations omitted). Ultimately in *Vinning*-El, the Seventh Circuit reversed the district court's decision to award summary judgment based on qualified immunity because there was a genuine issue of material fact as to whether the defendants were deliberately indifferent to the cell conditions. *Id.* at 925. Here, there likewise is a factual dispute as to whether Defendants were deliberately indifferent. Assuming Hicks' version of events, and assuming that Defendants ignored his complaints,[4] Hicks was forced to live without a recommended amount of water, within feet of a feces-filled toilet, and with bugs in his cell, for anywhere from one to six days. The case law is at odds with

---

[3] Courts outside the Seventh Circuit also have found that exposure to human waste, deprivation of water, and bug infestations are unconstitutional conditions of confinement. See, *e.g., DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (exposure to human waste for 36 hours was a sufficiently serious deprivation because it "evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment"); *Ramos v. Lamm*, 639 F.2d 559, 568, (10th Cir. 1980) (constitutional violated based on inadequate plumbing, ventilation, roach and insect infestation, and excessive odors, among other conditions); *Martino v. Casey*, 563 F. Supp. 984, 999 (D. Or. 1983) ("Functioning plumbing, including toilets, sinks and showers, is a basic necessity of civilized life. The provision of adequate means of hygiene, and the sanitary disposal of bodily wastes so that the wastes do not contaminate the cells, are constitutionally required."); *Heitman v. Gabriel*, 524 F. Supp. 622 (W.D. Mo. 1981) ("No inmate shall be confined *for more than one hour* in any locked cell which does not have working plumbing.") (emphasis added).

[4] Based on the maintenance log entry reflecting that a member of the MCC facilities department checked on the plumbing in Cell 1104 on October 14, 2005, it appears to be undisputed that at some point someone at the MCC had notice of a problem with the toilet in Cell 1104. What remains to be determined is how bad the problem was and how long it persisted.

Defendants' argument that there was no pre-existing law making it apparent that the conditions described by Hicks at his deposition were unlawful. Furthermore, Defendants *admitted* that the conditions Hicks complained of are all "major" problems that require prompt attention. Drawing all reasonable inferences in Plaintiff's favor, the Court denies Defendants' request for qualified immunity.

### B. First Amendment Retaliation Claim (Count II) as to Defendant Rolke

In Count II, Hicks alleges that Defendant Rolke violated his First Amendment rights because Rolke allegedly "took steps" to have Hicks placed in administrative detention in the Special Housing Unit in May 2006 in retaliation for the filing of this lawsuit. Defendants argue that Rolke is entitled to summary judgment on Count II because his conduct is protected by qualified immunity and because Rolke did not direct or consent to Hicks' placement in segregated housing in May 2006.

Defendants' motion rests on the contention that the protected speech activity forming the basis for Hicks' First Amendment claim was Rolke's assertion that Hicks was discussing his lawsuit against Rolke with other inmates. Defendants misapprehend Plaintiff's claims. The protected speech activity forming the basis of Hicks' First Amendment claim was his filing the lawsuit against Rolke. Inmates have a clear constitutional right of access to the courts, and "[t]he federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, as well as the right to be free from retaliation for exercising this right." *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996) (internal citations omitted). Hicks is not complaining about his ability (or inability) to discuss his lawsuit with fellow inmates; in fact, he maintains that he never discussed the lawsuit with other prisoners. Instead, he alleges that he

14

was placed in segregation in retaliation for exercising his constitutional right to file a lawsuit against Rolke.

Qualified immunity is not appropriate because "retaliation against constitutionally protected conduct is actionable regardless of whether the defendant's actions independently violate the constitution" and Defendant Rolke "would have been on notice that *any* retaliation, whatever its shape, could give rise to liability." *Babcock*, 102 F.3d at 276; s*ee also DeWalt*, 224 F.3d at 618 (concluding that a prison official may not retaliate against a prisoner for pursuing his right of access to the courts "even if the adverse action does not independently violate the Constitution."). The Seventh Circuit specifically has warned that courts should not "turn a blind eye to claims that prison officials have retaliated against inmates for exercising their right to seek judicial remedy." *Babcock*, 102 F.3d at 275. Rolke's qualified immunity defense rests on his assertion that Hicks discussed the pending lawsuit with other inmates. However, Hicks disputes that he spoke to other inmates about the lawsuit. If Hicks did not discuss the lawsuit with anyone else, the inference is that Rolke lied to Friar. If Hicks did discuss the lawsuit with other inmates, and his comments got back to Rolke, then Rolke's conduct would not have been constitutionally suspect. Because the central fact remains in dispute, summary judgment on qualified immunity grounds is not appropriate. See *Higgason v. Farley*, 83 F.3d 807, 810-11 (7th Cir. 1996) ("The record on this issue is a swearing contest, with [the inmate] asserting an invalid reason for the transfer, and the defendants asserting a valid reason. Summary judgment is inappropriate for this [retaliation] claim at this time.").

Defendants also contend that because Lieutenant Friar signed the administration detention order placing Hicks in the Special Housing Unit in May 2006, Rolke did not "direct or consent" to Hicks' placement in the Special Housing Unit. However, Rolke testified that he

informed Friar that Hicks was discussing with other inmates the fact that Hicks had filed a lawsuit against Rolke. Friar testified that, based on his reading of the May 18, 2006 administrative detention order, he issued the order because of security concerns. An inference can be made that Friar ordered the transfer because of Rolke's concerns. Seventh Circuit law holds that "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (quoting *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003)). There is sufficient evidence showing that Rolke "personally participated in or caused" Hicks's placement in segregation following the filing of his lawsuit by complaining to Friar about Hicks, which in turn caused Hicks to be removed from his unit and placed in segregated housing from May 18, 2006 to June 7, 2006. Disputed issues of fact preclude summary judgment in favor of Defendant Rolke on Count II.

## IV. Conclusion

For these reasons, the Court denies Plaintiff's partial motion for summary judgment [169] and grants in part and denies in part Defendants' motion for summary judgment [172]. With respect to Count I, the Court grants Defendants' motion for summary judgment as it pertains to Defendant Rolke, but denies Defendants' motion as it pertains to Defendants Irvin, Savich, Diamond, and Henry and also denies Plaintiffs' motion. With respect to Count II, the Court denies Defendants' motion for summary judgment. This case will proceed against Defendants Irvin, Savich, Diamond, and Henry on Count I and against Defendant Rolke on Count II.

Dated: September 17, 2012 _____
Robert M. Dow, Jr.
United States District Judge