IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHAD ALAN HICKS, #30016-424, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 06 C 645 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| SILAS IRVIN, ET AL., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chad Alan Hicks filed this prison civil rights lawsuit on May 2, 2006. The lawsuit, brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), arises under the United States Constitution, 42 U.S.C. § 1983, the Due Process Clause of the Fifth Amendment, and the First Amendment. The complaint names as Defendants several officials at the Metropolitan Correctional Center in Chicago ("MCC"). Hicks maintains that he was falsely accused of assaulting a correctional facility officer; that he was placed for six days in a segregated, bug-infested "dry cell" that was inundated with feces; and that he was retaliated against for filing suit in response to these conditions.

This case came before the Court for a one-day bench trial in August 2013. At trial, the Court heard the testimony of several witnesses, including Plaintiff Hicks, Defendants Silas Irvin, James Henry, Dennis Rolke, Lazo Savich, and James Diamond, and Dr. Daniel Greenstein, a psychologist at the MCC. The Court sets forth below its findings of fact and conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case and the evidence and testimony presented at trial.

## I. Procedural Background

Plaintiff filed this prison civil rights lawsuit without the assistance of counsel in 2006.[1] The complaint named as Defendants several officials at the MCC. Plaintiff maintained that he was falsely accused of assaulting a correctional facility officer; that he was placed for six days in a segregated, bug-infested "dry cell" that was inundated with feces; and that he was retaliated against for filing suit in response to these conditions. After weathering a motion to dismiss, Hicks filed his third amended complaint in October 2009, specifically alleging in Count I (against all Defendants) that his cell conditions violated the Fifth Amendment's prohibition on cruel and unusual punishment against pre-trial detainees and in Count II (brought only against Defendant Rolke) that Plaintiff was deprived of his First Amendment rights by being placed in administration detention in retaliation for the filing of this lawsuit.

Defendants moved for summary judgment under the Prison Litigation Reform Act ("PLRA" or the "Act"), arguing that Plaintiff had not exhausted his administrative remedies before filing suit in federal court. The Court denied the motion, concluding that the evidence in the record indicated that Hicks had used all of the regulatory hooks that were available to him. Each side then moved for summary judgment on the substantive claims. Plaintiff moved for partial summary judgment on Count I, and Defendants moved for summary judgment on both counts. With respect to Count I, the Court granted Defendants' motion for summary judgment as to Defendant Rolke, denied Defendants' motion as to Defendants Irvin, Savich, Diamond, and Henry, and also denied Plaintiffs' motion. With respect to Count II, the Court denied

---

[1] Approximately a year after the lawsuit was filed, the previously assigned judge recruited counsel for Plaintiff [see 32]; the Court expresses its gratitude to Plaintiff's pro bono counsel for their work on this case.

Defendants' motion.[2] The case then proceeded to a bench trial against Defendants Irvin, Savich, Diamond, and Henry on Plaintiff's Fifth Amendment Due Process claim and against Defendant Rolke on Plaintiff's First Amendment retaliation claim.

## II. Findings of Fact

The Court prefaces its decision by noting that it found some of the testimony offered by Plaintiff at trial less than convincing in several respects because it differed substantially from the detailed allegations in the complaint. Simply put, when pushed, Plaintiff could not identify with any specificity when the problems in his cell began and when he complained to Defendants about these problems. As addressed in more detail below, the timing in this case is everything. If Plaintiff identified objectively serious problems in his cell and they were promptly addressed, his claim fails. If his complaints were ignored or the problems were not addressed in a timely manner, then he suffered a constitutional violation. While the Court certainly is cognizant that the age of this case bears on the parties' ability to recall the events in question, and both Defendants and Plaintiff were unable to remember many of the specific details, Plaintiff bore the burden of proof at trial. Moreover, to the extent that the witnesses on both sides lacked a clear recollection of the events, the Court was able to incorporate its assessment of the documentary evidence into its analysis. And that evidence – as well as the testimony of the only non-party witness presented at trial, Dr. Greenstein – largely supports Defendants' rendition of the events.

### A. Plaintiff's 2005 Incarceration at the MCC

Plaintiff arrived at the MCC in August 2005, where he awaited trial on bank robbery charges. The MCC holds approximately 800 inmates. Inmates in the general population at the MCC are housed in two types of units—units with locking cells and dormitory-style units that do

---

[2] After the denial of summary judgment, Defendants initially filed a notice of appeal to the Seventh Circuit [193], but later dismissed the appeal [see 208].

3

not have cells. In units where there are cells, the cells are not locked during the day, and inmates may move freely about the unit. MCC units with cells generally house approximately 88 inmates who are guarded by one correctional officer. Inmates also move about freely on dormitory units. Dormitory units generally house approximately 112 inmates who are guarded by one correctional officer. The correctional officers stationed in the units with inmates are not armed with weapons.

Correctional officers are expected to maintain order in the units through mutual respect between the officer and the inmates and trying to establish some type of rapport with the inmates. A breakdown in the respect between the inmates and the correctional officers increases the likelihood of a correctional officer losing control of the unit. Correctional officers are trained to report anything that might disrupt the orderly running of a unit or the facility to a lieutenant.

The SHU is a segregated area at the MCC where inmates are housed for administrative or disciplinary reasons. Anyone entering the SHU was expected to sign in and out of a log. In 2005, there were approximately 20 inmates in the SHU at any given time. Correctional officers do not decide whether an inmate is placed or remains in the SHU; rather, that authority rests with the shift lieutenant. However, correctional officers report information to the shift lieutenant, and the lieutenant may rely on that information in placing an inmate in the SHU or determining whether the inmate should remain there.

Cells #3 and #4 in the SHU are used to house MCC inmates who are placed on suicide watch. SHU cell #4 is one of the designated cells for suicide watch and "dry cell" status. An inmate is placed on dry-cell status when he or she is suspected of ingesting contraband and the staff at the MCC wants to monitor the inmate's feces to recover the contraband. Placement on dry-cell status would involve turning off the toilet and plumbing in the inmate's cell. The

warden was the approving authority for an inmate to be placed on dry-cell status. No inmate was placed on dry cell status in 2005.

At the MCC, a segregation review committee met on a weekly basis to review the status of each inmate's status in the SHU. In October 2005, these meetings occurred on Thursdays and would involve, among others, the warden, associate wardens, the captain, the SHU lieutenant, Psychology, and Unit Management. Following the weekly Segregation Review Committee meeting, those involved in the meeting would go the SHU and visit each cell to check on the status of each inmate in the SHU and ensure that any problems the inmates had were being addressed.

On Saturday, October 8, 2005, at 10:24 p.m., Plaintiff was moved to cell #4 in the SHU. On Friday, October 14, 2005, at 12:58 a.m., Mr. Hicks was moved from SHU cell #4 to SHU cell #14. That same day, Rafael Martinez, an employee with the facilities department at the MCC, entered the SHU to check on the plumbing and perform repairs in SHU cell #4. Hicks remained on administrative detention and in SHU cell #14 until he was transferred out of the MCC on Tuesday, October 25, 2005, at 11:00 a.m.

In the operative complaint, Plaintiff alleged that he was placed on dry-cell status during the entire time that he was in cell #4 and that the only drinking water that he received was a 4 ounce cup with meals. However, at trial, Plaintiff stipulated that he was not on dry-cell status during his time in the SHU, but that he only received a 4-6 ounce cup of water with meals. On cross-examination, he admitted that he also received water when he received his medication. Plaintiff also was asked if he requested drinking water and was refused. He first answered by stating that he asked for running water from his sink, and then testified that he could not recall "ask[ing] the Special Housing Unit correctional officers for water and they refused to give it to

5

[him]." Plaintiff also testified that he was able to shower either every other day or three times per week.

At trial, Plaintiff also testified that for the entire time that he was in SHU cell #4, the toilet in his cell was broken and would back up with feces when cells on both side flushed their toilet. He did not state that the toilet would actually overflow or that his cell was inundated by feces at any time (as alleged in the complaint). On cross examination, Plaintiff stated that the toilet overflowed "a little bit, but not as far as me flooding the cell." He also testified that he noticed bugs in his cell beginning on his first full day in SHU cell #4 and continuing for the entire time he was in the cell. He described the bugs as crawling bugs on the floor and flying bugs around the sink and toilet. He could not say how many bugs he saw, other than to say it was more than one. He also testified that none of the insects in SHU cell #4 ever came into contact with him or bit him.

The operative complaint alleges, and Plaintiff testified at trial, that he told Defendants Irvin, Henry, Savich, and Diamond about his cell conditions at least once during his time in SHU cell #4. During trial, on direct, Plaintiff testified that he told Defendant Warden Irvin about his cell conditions "more towards the beginning of my stay, the middle of my stay," but on cross-examination, he testified that he could not say whether it was the beginning, middle, or end of his stay. He could not say how many times he spoke to Irvin or what Irvin said in response to his complaints. Plaintiff testified that he told Defendant Associate Warden Henry about his cell conditions while he was still in SHU cell #4, but did not provide more specificity as to when that conversation occurred nor could he recall what Henry said in response to his complaints. Plaintiff testified that he told Defendant Captain Savich about his cell conditions "more towards the beginning" of his stay, but under cross-examination, he testified that he did not remember

when he complained to Savich about his cell conditions and could not say roughly when this conversation occurred. He also could not remember what Savich said in response to his complaints. On direct, he testified that he told Defendant Lieutenant Diamond about his cell conditions "while I was first in my cell * * * more towards the beginning," and cross-examination, he testified that he did not remember when he complained to Diamond about his cell conditions and could not say whether the conversation occurred in the beginning, middle, or end of his stay in SHU cell #4. He also could not remember what Diamond said in response to his complaints. During trial, all of the Defendants testified that the lack of water, a broken toilet, and the presence of bugs in a cell are all significant issues that should be promptly addressed and typically would be promptly addressed if an inmate complained.

Plaintiff was placed on suicide watch in the SHU on October 8, 2005 at 9:55 p.m., as a result of being charged with assaulting Defendant Rolke, a correctional officer at the MCC. Dr. Greenstein signed in to the SHU at 8:30 a.m. on October 9, 2005.[3] After the initial risk assessment, Dr. Greenstein's involvement with the suicide watch would next be daily personal contact with the inmate in the SHU law library. This contact would involve reviewing the suicide watch log, talking to the suicide watch officer, and speaking with the inmate on suicide watch. Documenting these activities in a suicide watch contact or post-suicide watch report was a regular part of Dr. Greenstein's duties when monitoring an inmate on suicide watch. Dr. Greenstein testified that if an inmate stated that he was being denied access to water, that his cell was infested with bugs, or that his cell was inundated with feces when toilets in adjacent cells were flushed, he would likely record that in his report. His report does not reference Plaintiff's

---

[3] In October 2005, regular hours for the psychology staff at the MCC were generally 7:30 a.m. to 4:00 p.m., and if an inmate was placed on suicide watch outside of regular hours, Dr. Greenstein would be contacted by the operations lieutenant and would discuss the circumstances of the inmate being placed on suicide watch.

7

complaints, but Plaintiff also testified that he did not report these conditions to Dr. Greenstein. The suicide watch for Hicks was terminated at 9:00 a.m. on October 9, 2005.

After suicide watch was terminated, Dr. Greenstein or someone else from psychology would follow up with the inmate. As a regular part of his duties, it was Dr. Greenstein's routine and practice to document his follow-up encounter with the inmate in a contact note recorded in the MCC s psychology data system. On October 9, 2005, Dr. Greenstein returned to the SHU at 1:05 p.m. and 3:10 p.m. The parties agree that Dr. Greenstein likely would have seen Hicks at one of these times. A suicide prevention follow-up note for Plaintiff was introduced at trial. Dr. Greenstein recorded in the note that he spoke with Plaintiff in the "p.m." The note does not reference any statements by Plaintiff about his cell conditions.

Defendants typically would sign the log book when they made rounds through the SHU. On October 13, 2005, at approximately 1:45 p.m., Defendant Irvin, the MCC's Warden, and Defendant Henry made rounds through segregated housing. This was the first time during the relevant time period that these Defendants signed into the SHU log. Neither Irvin nor Henry recalls speaking with Plaintiff. On October 12 and 14, 2005, Defendant Savich, a captain at the MCC, signed into the log book. He testified that during his rounds he would stop by each cell and, if the inmate requested, he would talk to the inmate. Savich testified that he did not sign into the log book every time that he went on rounds, but because the unit fell directly under his responsibilities, he typically visited the SHU "at least two, three, four times a week." He also does not remember Plaintiff.

Defendant Diamond, a lieutenant at the MCC, made rounds through the unit on at least October 11, 12, 13, and 14, 2005. He remembers Plaintiff, but does not recall any specific conversations that he had with Plaintiff. However, he testified that he is certain that he did not

8

leave Plaintiff in a cell without access to water. According to Diamond, he remembers only one instance in which an SHU inmate had a sink that did not work. The inmate told Diamond that he was alright in the cell, and Diamond directed SHU staff to give the inmate water whenever he asked for it and also followed up with other staff to make sure the problem was fixed. In short, Plaintiff testified that he verbally complained to Irvin, Henry, Savich, and Diamond about the bugs, clogged toilet, and lack of water in Cell 1104 while they made rounds through the SHU, and these Defendants do not recall these complaints, but all testified that corrective action would have been taken had Plaintiff complained.

### B. Plaintiff's 2006 incarceration at the MCC

Plaintiff returned to the MCC on April 6, 2006, and was housed in the general population. On May 18, 2006, Plaintiff was moved to the SHU, where he remained until June 7, 2006. Plaintiff testified that he did not know why he was put in the SHU in May 2006. He only remembers that Lieutenant Calvin Friar, who signed the administrative detention order, told him he was being sent to the SHU and said something about correctional officer Rolke. In May 2006, Rolke was working a post called "Sick and Annual," in which the assigned officer will fill in for other officers who are either sick or on vacation. Rolke did not see Plaintiff at the MCC during May 2006, or at any time after October 2005.

On May 2, 2006, Plaintiff filed an amended complaint regarding his October 2005 cell conditions. The amended complaint and summons were served on Rolke on May 4, 2006. Rolke testified that on or about May 18, 2006, he heard from an inmate that Plaintiff was back in the MCC and discussing the lawsuit that he had filed against Rolke. Plaintiff testified that he never discussed Rolke or his complaint with any other inmates at the MCC. Rolke informed his supervisor, Lieutenant Calvin Friar, that Plaintiff was discussing his lawsuit against Rolke with

other inmates. Rolke testified that when he spoke to Lieutenant Friar, Rolke did not suggest or ask that Plaintiff be placed in segregated housing. Rolke understood that, if Friar decided there was a problem, Friar had the options of removing Plaintiff from the floor where he was residing, moving him to the SHU or, if situation was severe enough, moving Plaintiff to another correctional facility. Rolke did not have the authority to move Plaintiff or any other inmate to the SHU. Both Irvin and Henry testified that an inmate speaking about a correctional officer could be a threat.

## II. Analysis

"In an action tried on the facts without a jury * * * the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). Once the findings and conclusions either are stated on the record after the close of the evidence or, as in this case, appear in a memorandum opinion and order, judgment must be entered under Rule 58.

### A. Fifth Amended Due Process Claim (Count I)

As a pretrial detainee at the time of the events giving rise to this action, Plaintiff's conditions of confinement claim arises under the Due Process Clause of the Fifth Amendment. The Seventh Circuit has held that pretrial detainees are "entitled to at least the same protection against deliberate indifference to [their] basic needs as is available to convicted prisoners under the Eighth Amendment." *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (citing *Bell v. Wolfish¸* 441 U.S. 520, 535 n.16 (1979)); see also *Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002) ("The protections for pre-trial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'") (quoting in part *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Under the Eighth Amendment, "the plaintiff has the burden of showing that (1) the harm to the plaintiff was objectively serious; and

(2) that the official was deliberately indifferent to [the plaintiff's] health or safety." *Cavalieri*, 321 F.3d at 620 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). When reviewing conditions of confinement, courts "consider the totality of the conditions of confinement to determine whether a prisoner has been deprived of basic human needs." *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989).

Plaintiff claims that Defendants Savich, Henry, Irvin, and Diamond violated his Fifth Amendment Due Process rights by failing to rectify the conditions that he claims to have experienced in the SHU in October 2005. In his third amended complaint, Plaintiff alleges that, between October 8 and October 14, 2005, he was deprived of "basic human needs" in the Special Housing Unit because he was "deprived of water to care for himself or to drink, except for a small cup of water with meals," his cell was "infested" with "crawling bugs," and his cell was "inundated with feces when toilets in adjacent cells flushed."

Plaintiff's trial testimony was a substantially less dramatic. With respect to access to water, Plaintiff first testified that the only water he received was with his meals. Under cross-examination, Plaintiff admitted that he also received drinking water when he received medication. Similarly, he testified on cross examination that he could not recall whether he ever asked an officer on the SHU for water and they refused to give it to him, while at his deposition Hicks testified he had never asked for additional water beyond what was provided with his meals.

With respect to the issues with his toilet, he alleged that his cell was inundated by feces for the entire time he was in the SHU in October 2005. However, at trial, Hicks testified that his toilet would back up with feces when cells on both side flushed their toilet, but did not state that the toilet would actually overflow or that his cell was inundated by feces at any time. On cross-

11

examination, Hicks first stated that his cell was inundated by feces when the toilets in the adjacent cell flushed and that he could not recall the first time that happened. When confronted with his deposition testimony that the toilet had not actually overflowed, Hicks testified that he could not say whether the toilet ever actually overflowed on to the floor of his cell. Hicks then changed his testimony yet again, testifying that it overflowed "a little bit, but not as far as me flooding the cell."

In regard to the bug infestation alleged in his complaint, Plaintiff testified that he noticed bugs in his cell beginning on his first full day in SHU cell #4 and continuing for the entire time he was in the cell. He could not say how many bugs he saw, other than to say it was more than one. On cross examination, Hicks also admitted that at his deposition he testified that he could not remember when he first saw insects in his cell and that none of the insects in SHU cell #4 ever came into contact with him or bit him.

Based on the case law, (i) access to water for drinking or washing, (ii) working plumbing, and (iii) freedom from bug infestations have been found to be basic human necessities in the prison context. See *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("[F]ilth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] * * * drinking water contain[ing] small black worms which would eventually turn into small black flies" would violate the Eighth Amendment); *Pritchett v. Page*, 2000 WL 1129891, at *9 (N.D. Ill. Aug. 9, 2000) (insect infestations can be actionable); *Ruff v. Godinez*, 1993 WL 239045, at *4 (N.D. Ill. June 28, 1993) (inadequate plumbing, coupled with insect infestation, rose to the level of Eighth Amendment violation); *Pelker*, 891 F.2d at 139 (placing a prisoner in a feces-smeared cell for three days without running water, while ignoring

his requests for water and cleaning supplies, violates the Eighth Amendment); *Kimbrough v. O'Neil*, 523 F.2d 1057, 1059 (7th Cir. 1975) (conditions including lack of toilet, lack of water for drinking or washing, and lack of mattress, bedding, or blankets, "even for a period of three days, could constitute a violation of the Eighth Amendment"). Defendants themselves testified that the lack of water, a broken toilet, and bug infestation are all serious conditions which should be immediately rectified.

The first question is whether Plaintiff has demonstrated that he was denied basic needs at all. The allegations in Plaintiff's operative complaint far exceed the evidence presented at trial as to the severity of these conditions. However, the evidence at trial does suggest that Plaintiff's toilet or sink did have problems at some point, as Plaintiff was moved from cell #4 to cell #14 on at 12:58 a.m. on October 14, 2005, and later that same day an employee with the facilities department at the MCC performed repairs in cell #4. For purposes of this opinion, the Court assumes that Plaintiff did experience a deprivation of basic needs for some amount of time – albeit for a much shorter period of time than alleged in Plaintiff's complaint.

But a deprivation alone does not suffice to carry the day for Plaintiff in this lawsuit. To prevail, Plaintiff also must demonstrate that Defendants Irvin, Henry, Savich, and Diamond knew about the harm and were deliberately indifference to Plaintiff's health and safety. Plaintiff testified that he verbally complained to Defendants Irvin, Henry, Savich, and Diamond about his cell conditions. Defendants do not recall him or his time in the SHU, and so Defendants cannot deny his allegations outright. However, simply because Defendants do not recall Plaintiff does not mean that he complained.[4] Each Defendant credibly testified that if such conditions had been

---

[4] Diamond, who supervised the SHU in October 2005, remembers Plaintiff. Irvin, Henry and Savich do not. This is not surprising in light of their institutional responsibilities and the fact that between 2,400 and 2,500 inmates passed through the MCC in 2005 alone. Plaintiff has not presented any case law, nor

brought to their attention as Plaintiff testified, they would have taken immediate steps to remedy the situation. When pushed at trial, Plaintiff could not recall how often he complained, when exactly he complained, or even what exactly he said.

As previously indicated, Plaintiff's version of the events simply does not withstand scrutiny, especially when considered in the totality of the oral and written record in this case. Plaintiff testified on direct that he told Warden Irvin about his cell conditions "more towards the beginning of my stay, the middle of my stay." Then, under cross-examination, he testified that he could not say whether it was the beginning, middle or end of his stay in SHU cell #4 that he told Irvin about his cell conditions. But even more problematic, the documentary evidence suggests that Irvin was never even in the SHU until October 13, several days after Plaintiff originally claimed to have told the warden about his issues. The same goes for Plaintiff's testimony regarding Associate Warden Henry. Plaintiff testified that he told Henry about his cell conditions while he was still in SHU cell #4, but did not provide more specificity as to when that conversation occurred. Again, the documentary evidence puts Henry in the SHU on October 13, but not before. Plaintiff's testimony regarding Savich and Diamond suggests that he complained to them on October 8 or 9, but again, these Defendants did not even work on October 8, 9, or 10, and Savich did not sign into the SHU log until October 12. Although Savich did not always sign in, the earliest that he could have visited the SHU was October 11, 2 to 3 days after Plaintiff said he complained about the conditions in his cell. Similarly, the first time that Diamond worked in the SHU was October 11, 2 to 3 days after Plaintiff testified that he complained.

Other evidence supports the inference that, to the extent that Plaintiff brought an issue with his cell to Defendants' attention, that issue was timely addressed in a manner consistent

---

has the Court found any in its own research, which supports Plaintiff's theory that Defendants' lack of recollection mandates a judgment for Plaintiff.

14

with the general practices that Defendants described. Plaintiff was placed in the SHU the evening of October 8, 2005. Dr. Greenstein twice visited Plaintiff on October 9. Dr. Greenstein's testimony and records establish that, given two opportunities, Plaintiff did not raise any issues regarding this cell conditions with Dr. Greenstein during his first day in SHU cell #4. This evidence supports the inference that either Plaintiff was not experiencing adverse cell conditions on October 9, 2005, or that those conditions were not causing Hicks objectively serious harm since he did not bother to mention them to Dr. Greenstein.

In sum, the evidence presented at trial established that Diamond did not work in the SHU until October, 11, 2005; that Savich likely did not enter the SHU prior to October 12, 2005; and that Irvin and Henry did not work at the MCC during the first four full days of Hicks' stay in the SHU (October 9, 2005 through October 12, 2005), and did not enter the SHU until October 13, 2005 at 1:45 p.m. On October 14, 2005, at 12:58 a.m., eleven hours after Irvin and Henry passed through the SHU during their weekly rounds to check on the SHU inmates, MCC records indicate that Hicks was transferred to a different cell. The next day, Rafael Martinez, an MCC employee responsible for plumbing work, entered the SHU to check on the plumbing in cell #4. Thus, the evidence presented at trial supports the conclusion that Plaintiff did in fact complain, but not until October 13, just prior to being removed from Cell #4. As stated previously, the Court did not find Plaintiff to be particularly credible, given that he claimed to have experienced unconstitutional conditions—which he could remember in detail—but that he could not recall when he complained to Defendants. To be sure, the Court does not attribute Plaintiff's vague testimony to any intent to deceive, and the absence of detail in his version of the events is no doubt to some degree the result of the passage of time. But it is Plaintiff's burden and he cannot meet it. Moreover—and perhaps even more importantly—the Court found credible the

Defendants' testimony that these type of issues—particularly with respect to access to drinking water and a working toilet—were addressed promptly both in general and, as the documentary record indicates, specifically in this case.

In sum, having carefully considered the testimony and documentary evidence presented at trial, the Court concludes that Plaintiff could not have told any of the Defendants about his cell conditions at the beginning of his time in SHU cell #4, as he alleged in his complaint and testified during his direct examination. Additionally, Plaintiff's and Defendants' testimony taken together support the inference that Plaintiff did complain about an issue with the plumbing in his cell, but not until October 13, 2005, and, consistent with their general practices, Defendants took steps that day to have Hicks removed from the cell and the problem repaired. In total, the evidence does not support a finding that any Defendant was deliberately indifferent to Hicks' health or safety in violation of his Fifth Amendment rights.

### B. First Amendment Retaliation Claim (Count II) as to Defendant Rolke

In Count II, Hicks alleges that Defendant Rolke violated his First Amendment rights because Rolke "took steps" to have Plaintiff placed in administrative detention in the Special Housing Unit in May 2006 in retaliation for the filing of this lawsuit. As clarified in the ruling on the parties' summary judgment motions, Plaintiff is not complaining about his ability (or inability) to discuss his lawsuit with fellow inmates; in fact, Plaintiff maintains that he never discussed the lawsuit with other prisoners. Instead, he maintains that he was placed in the SHU in retaliation for exercising his constitutional right to file a lawsuit against Rolke.

Inmates have a clear constitutional right of access to the courts, and "[t]he federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, as well as the right to be free from retaliation for exercising this right." *Babcock v.*

*White*, 102 F.3d 267, 276 (7th Cir. 1996) (internal citations omitted). However, even if prison officials discipline a prisoner because of his speech, "there is no constitutional violation if the censorship was 'reasonably related to a legitimate penological interest.'" *Boumanv. Robinson*, 2007 WL 5559324, *4 (W.D. Wis. Aug. 10, 2007) (citing *Turner v. Safley*, 482 U.S. 78 (1987)). In evaluating whether a prison official's retaliatory action was rationally related to a valid penological interest, the Seventh Circuit looks at the potential impact of accommodating the prisoner's speech and the availability of alternative means for a prisoner to express his complaints. See *Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010). The Seventh Circuit has stated that the retaliation inquiry should be undertaken in light of the "general tenor" of the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), which "specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). Courts "should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* In addition, Seventh Circuit law holds that "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (quoting *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003)).

The evidence presented at trial is insufficient to conclude that Defendant Rolke retaliated against Plaintiff because Plaintiff filed a lawsuit against Rolke. Rolke testified credibly that he had no authority over Plaintiff's placement in the SHU and did not ask that Plaintiff be placed in the SHU. Instead, Rolke called his lieutenant, as he had been trained to do, to report that he had heard from another inmate that Plaintiff was speaking about the lawsuit with other inmates. Rolke's decision to contact Friar about what he had heard was consistent with Rolke's training

and the expectation of his supervisors (Irvin and Henry), who also testified at trial. Rolke also testified that, if Friar was concerned about Plaintiff's conduct, Friar had other options for dealing with the situation that did not involve putting Plaintiff in the SHU. An inference can be made that Friar ordered the transfer in part because of Rolke's concerns; however, the credible testimony at trial established that Friar had multiple options in addition to placing Plaintiff in the SHU and that the decision to place Plaintiff in the SHU (as opposed to taking an alternative action) was Friar's alone. In other words, the undisputed evidence at trial identified Friar as the decisionmaker. To hold Rolke liable for reporting what he had heard would go too far in these circumstances. Perhaps this would have been a different case if Friar, the individual who actually authorized Plaintiff's placement in the SHU, had been a defendant and was shown to have put Plaintiff in the SHU for an improper reason. But he is not a defendant and no such showing was made.

In any event, even if the decision to place Plaintiff in the SHU could be attributed to Rolke, Rolke testified credibly that he contacted Friar not because Plaintiff had filed his lawsuit (which Rolke had learned about two weeks earlier), but because he was concerned that knowledge by other inmates of the lawsuit could undermine his authority within the MCC. Had Rolke contacted Friar immediately after he learned about the lawsuit—for instance, when he was served on May 4, 2006—then Plaintiff's retaliation theory would be more appealing. But he did not. Rather, Rolke contacted Friar only when Rolke heard from other inmates that Plaintiff was discussing the lawsuit at the jail. The timeline of events makes it more likely that Rolke was not retaliating against Plaintiff for filing the lawsuit, but rather had a valid basis—either his duty to report this information to his supervisors or the perceived threat to his authority amongst the inmates—for bringing Plaintiff's actions to his lieutenant's attention two weeks later. The

credibility of Rolke's testimony on this score was further supported by the testimony of Irvin and Henry that an inmate speaking about a public lawsuit filed against a correctional officer could present a valid security concern because it has the potential to undermine the officer's stature in the unit and his ability to control and supervise that unit, which the officer patrols by himself and unarmed.

In sum, the Court concludes on the basis of the credible evidence presented at trial that Rolke acted consistent with a legitimate penological interest in reporting what he had heard to his supervisor and that his report did not violate Plaintiff's First Amendment rights.

## III.  Conclusion

For these reasons, the Court enters judgment in favor of Defendants Irvin, Savich, Diamond, and Henry and against Plaintiff on Count I and in favor of Defendant Rolke and against Plaintiff on Count II of Plaintiff's complaint.

Dated:  March 31, 2014

Robert M. Dow, Jr.
United States District Judge